## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JOHNNY LEE SANDERS, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-20-01279-JD |
| | ) | |
| AEROTEK INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is the Motion for Summary Judgment ("Motion") filed by
Defendant Aerotek Inc. ("Aerotek") [Doc. No. 69]. Plaintiff Johnny Lee Sanders, Jr. filed
a response in opposition ("Response") [Doc. No. 75], and Aerotek filed a reply [Doc. No.
76]. With leave of Court, Sanders filed a surreply [Doc. No. 82].[1]  For the reasons stated
below, the Court grants the Motion.

## I.    BACKGROUND

At the time this suit was filed, Mr. Sanders was 60 years old and a former
employee of Aerotek. He filed this lawsuit following the termination of his employment
as a janitor at Integris Baptist Medical Center ("Integris") in May 2020. He asserts claims
for age discrimination and retaliation under the Age Discrimination in Employment Act

---

[1] In his surreply, Sanders asks the Court to deem Aerotek's motion for summary
judgment as premature "until such time as . . . discovery issues can be resolved."
Surreply at 4. The Court denies Sanders' request as untimely. Under the Scheduling
Order, discovery was to be completed by August 1, 2023, and "[a]ll discovery motions
[were to] be filed 30 days in advance of the discovery deadline." *See* [Doc. No. 47 ¶ 6].
That deadline has long passed, and Sanders has not shown good cause for its
modification.

("ADEA") and race discrimination and retaliation under Title VII. Aerotek moves for summary judgment.

## II.    LEGAL STANDARDS

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (internal quotation marks and citation omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (explaining that a dispute over a material fact is genuine "if a rational jury could find in favor of the nonmoving party on the evidence presented" (citation omitted)). In applying this standard, the Court "'review[s] the facts and all reasonable inferences those facts support[] in the light most favorable to the nonmoving party.'" *Doe*, 952 F.3d at 1189 (second alteration in original) (quoting *Evans v. Sandy City*, 944 F.3d 847, 852 (10th Cir. 2019)). "In reviewing the facts, at summary judgment, the party who bears a burden of proof on an issue bears the burden of production rather than the burden of persuasion." *Markley v. U.S. Bank Nat'l Ass'n*, 59 F.4th 1072, 1080 (10th Cir. 2023) (citing *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1115 (10th Cir. 2007)).

"A pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d

2

1106, 1110 (10th Cir. 1991). But even a pro se litigant "does not escape the essential burden under summary judgment standards of establishing that there is a genuine issue as to a fact material to his case in order to avert summary judgment." *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990) (citing cases). It is not "the proper function of the district court to assume the role of advocate for the pro se litigant" or to salvage his claims. *Hall*, 935 F.2d at 1110. Nor does the Court "take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record." *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). The Court "may seek to reassure itself by some examination of the record before granting summary judgment against a pro se litigant." *See* Fed. R. Civ. P. 56(e)(4) advisory committee's notes to 2010 amendment.[2]  However, review of a district court's ruling on summary

---

[2]  Although Sanders disputes most of Aerotek's material facts, he does not refer with particularity to those portions of the record upon which he relies. Here, the Court has satisfied its independent duty under Federal Rule of Civil Procedure 56(e)(3) by examining the record and cited materials. Additionally, Sanders' reliance on the Oklahoma Employment Security Commission's ("OESC") determination—that he was entitled to unemployment benefits and discharged for performance rather than misconduct—to create a fact issue for his ADEA and Title VII claims is misplaced. *See* Response at 2–3, 9; *Hayes v. Corr. Mgmt. Affiliates Inc.*, Nos. 95-6449, 96-6030, 107 F.3d 880, 1997 WL 111262, at *2 (10th Cir. Mar. 13, 1997) (unpublished) (explaining that misconduct to deny unemployment benefits is not the same as an employer's reason for termination from employment because an employee may be terminated for many reasons not rising to the level of misconduct); *Doby v. Okla. Emp. Sec. Comm'n*, 1991 OK CIV APP 132, ¶ 6, 823 P.2d 390, 392 (same). Likewise, any argument that Aerotek is estopped, precluded, or bound by that determination is without merit. *See* Okla. Stat. tit. 40, § 2-610.1 ("Any findings of fact or law, judgment, conclusion or final order made by the [OESC], its referees, the Appeal Tribunal or Board of Review in an unemployment insurance proceeding shall not be conclusive or binding in any separate or subsequent action or proceeding, and shall not be used as evidence in any separate or subsequent action or proceeding, between an individual and his . . . prior employer . . . ."); *Hayes*, 1997 WL 111262, at *2 (holding that the employer was "not precluded from showing that

judgment is "from the perspective of the district court at the time it made its ruling, ordinarily limiting . . . review to the materials adequately brought to the attention of the district court by the parties." *SEC v. GenAudio Inc.*, 32 F.4th 902, 920 (10th Cir. 2022) (citation omitted).

## III.     UNDISPUTED MATERIAL FACTS[3]

In December 2019, Aerotek, a temporary staffing agency, hired Mr. Sanders, a black male, to perform janitorial work for its client, Integris. Sanders' employment with Aerotek was coextensive with his temporary assignment with Integris, meaning that his Aerotek employment would end if his Integris assignment ended. Sanders worked as a janitor in hospital housekeeping at Integris; he was assigned to the third shift. At the time of his hire, Sanders was 60 years old.

Integris provided Mr. Sanders with his work schedule, daily job assignments, and training. His job duties included cleaning and disinfecting non-occupied patient rooms. Integris used a system called BedBoard to communicate room assignments to Sanders. Integris supplied Sanders with tools and equipment to complete his assignments, including personal protective equipment ("PPE") and cleaning disinfectant.

After the COVID-19 pandemic began in 2020, Integris reviewed its COVID-19

---

plaintiff was dismissed for misconduct" and concluding that "summary judgment [for the employer] was appropriate").

[3] This section includes material facts that are properly supported by the asserting party and not opposed in the manner required by Rule 56(c). Any fact not supported by citation to the record is disregarded. All facts are stated in the light most favorable to the nonmovant, Mr. Sanders.

cleaning and PPE policies with Mr. Sanders. The PPE provided to Sanders included an N95 mask, a plastic shield to be worn over the N95 mask, a protective gown, latex gloves, and protective feet coverings. Although Sanders claims the gown provided was too large, he admits that he never notified anyone that the gown did not fit. Integris' COVID-19 cleaning policies required an N95 mask to be worn when cleaning a room occupied by a COVID-19 patient, but its policies did not require an N95 mask when cleaning a vacant room following a COVID-19 patient's discharge.

One of Mr. Sanders' supervisors was shift lead, Kayelin Ordonez, a non-Aerotek employee. Wayne Trim was an environmental services manager at Integris during Sanders' employment, and Nancy Arenas was an operations manager. On March 19, 2020, Trim emailed Arenas and indicated he had verbally counseled Sanders about his cleaning of Room 801 on March 17, 2020. Trim advised that he and Sanders discussed "the blood on the bed rails and walls," but Sanders maintained that "he had checked the room." [Doc. No. 69-7 at 2].[4]

During the COVID-19 pandemic, the Integris housekeeping team used "walkie-talkies" to communicate, in addition to pagers and the BedBoard system. On April 2, 2020, Arenas and Ordonez met with Mr. Sanders over concerns he was not answering his walkie-talkie when called. Arenas advised Sanders that her "decision to utilize radios as an improved form of communication . . . was not an option, we are to use them." [Doc.

---

[4] The Court uses CM/ECF page numbering from the top of the district court docket filings in this Order.

No. 69-8 at 2]. Additionally, she advised Sanders that if he continued not to respond timely, she would terminate him from his Integris work assignment. Sanders acknowledged in his deposition testimony that he understood he could be terminated for failing to respond to walkie-talkie calls from his shift lead.[5] He admitted he continued to be nonresponsive to walkie-talkie calls after Arenas told him it was a terminable offense. *See* Sanders' Dep. Tr. at 142:1–25.

In April 2020, there were at least three documented instances of Mr. Sanders not timely responding to walkie-talkie calls for increments up to 45 minutes. On April 15, 2020, Arenas emailed Aerotek's Recruiting Manager Taylor Singleton seeking a replacement for Sanders because of his repeated job performance issues, which included his failure to timely respond to walkie-talkie calls and leaving his radio unattended.

On May 8, 2020, Integris arranged for third-party fit tests for Sanders' entire housekeeping shift to ensure their N95 masks fit properly. According to Arenas' May 11, 2020 email to Aerotek, Sanders could not be fit tested that day because of his beard.[6] Sanders was asked about this in his deposition, to which he stated he never agreed to shave for the fit test, but he also did not openly refuse to shave. *See* Sanders' Dep. Tr. at 188:6–15. When pressed by defense counsel, Sanders admitted that when the "lead"

---

[5] Despite this acknowledgement, Sanders indicated in his deposition testimony that he "could care less about the walkie-talkie." *See* Sanders' Dep. Tr. at 137:5–9 [Doc. No. 69-1 at 25].

[6] In Arenas' April 2, 2020 statement, she stated that she asked Sanders "to shave because according to CDC guidelines when wearing N95 masks, one should not have any facial hair," but that Sanders told her he did not need to shave because the mask fit him well. *See* [Doc. No. 69-8 at 2].

asked why he would not shave, he explained he had "folliculitis . . . a skin condition," which would result in ingrown hairs and a rash on his face if he shaved. *See id.* at 189:10–22.

Sometime in early May 2020, Mr. Sanders told Trim to go ahead and fire him so he could collect unemployment. On May 13, 2020, Aerotek Employee Relations Specialist Alicia Lozano discussed with Sanders via telephone a final warning he was receiving for performance issues. On May 15, 2020, Sanders received the final written warning via email from Lozano, identifying the specific performance issues upon which he needed to improve, or he would be subject to further discipline, up to and including termination. The final written warning identified three specific areas for improvement: (1) Sanders' responsiveness to walkie-talkie calls; (2) using his time in between cleaning rooms to be productive, to include notifying his shift leader or manager when he completed assigned duties and requesting additional work; and (3) being respectful and professional toward others at work. Sanders told Lozano in the May 13 telephone call that he would improve on responding to walkie-talkie calls.

Attached to the final written warning was Aerotek's Employee Conduct and Work Rules Policy with five items highlighted for Mr. Sanders: (1) behaving in an insubordinate or disrespectful manner; (2) behaving in a rude or unprofessional manner; (3) disclosing business secrets or confidential information; (4) violating personnel policies; and (5) performing duties or conducting oneself in an unsatisfactory manner. On May 18, 2020, Aerotek's on-premises manager, Daley Hand-Roybal, emailed Lozano requesting to move forward with ending Sanders' Integris assignment after Sanders

refused to clean COVID-19 rooms assigned to him over the weekend. After Integris asked to end Sanders' work assignment, Sanders emailed Lozano on May 18 to inform her he would not sign the final written warning because of a reported health and safety concern. Specifically, Sanders alleged that he was intentionally taken to a COVID-19 isolation area without PPE in March 2020, and after reporting his health and safety concern, he was assigned rooms to clean with patients who had tested positive for COVID-19.

Mr. Sanders acknowledged in his deposition that, when he was assigned to clean hospital rooms that were previously occupied by patients diagnosed with COVID-19, he "refused to clean COVID-19 rooms, period." Sanders' Dep. Tr. at 179:25–180:16. He admitted he was unaware if any other co-workers besides him had to clean COVID-19 rooms. *See id.* at 60:21–24.

Mr. Sanders indicated in his deposition that he was responsible, in part, for cleaning Integris' ER in March, April, and May 2020. He also recognized that people who appeared in the ER would get treated faster if the rooms were cleaned more promptly, and that his refusal to timely clean patient rooms could potentially have a real-life consequence for a patient waiting on the room.

On May 26, 2020, Lozano notified Mr. Sanders by email that his Integris assignment was ending due to his performance issues and refusal to clean assigned rooms. Lozano advised Sanders that he remained eligible to apply for other positions with Aerotek. Sanders admittedly never requested a medical accommodation relating to COVID-19 from either Integris or Aerotek.

After Integris requested Aerotek end Mr. Sanders' assignment, Sanders never reached out to Aerotek for additional job placement. Moreover, Aerotek has no record of Sanders applying for any jobs with it since his Integris assignment ended in May 2020. Sanders never contracted COVID-19 during his Integris assignment or employment with Aerotek.

Aerotek seeks summary judgment on the remaining claims in Mr. Sanders' complaint of age and race discrimination and retaliation.

## IV.  ANALYSIS

### A.    Aerotek is entitled to summary judgment on Sanders' ADEA age discrimination claim.

The ADEA makes it unlawful for employers "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA's prohibition on discrimination protects "individuals who are at least 40 years of age." 29 U.S.C. § 631(a).

A plaintiff suing under the ADEA "must prove that age was [a] but-for cause of the employer's adverse decision." *Markley v. U.S. Bank Nat'l Ass'n*, 59 F.4th 1072, 1081 (10th Cir. 2023) (internal quotation marks and citation omitted). A plaintiff may carry this burden by presenting direct evidence of the employer's discriminatory intent. *See id.*; *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1114 (10th Cir. 2007). An ADEA plaintiff lacking evidence of discriminatory intent may still meet his burden by presenting circumstantial evidence creating an inference of a discriminatory motive under the

*McDonnell Douglas*[7] burden-shifting framework. *See Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1195 (10th Cir. 2008); *Markley*, 59 F.4th at 1081; *Riggs*, 497 F.3d at 1114. Because Mr. Sanders presents no direct evidence that age discrimination played any role in his termination, he must proceed under the *McDonnell Douglas* framework.

Under the first step of the burden-shifting framework, a plaintiff must establish a prima facie case of age discrimination. *Markley*, 59 F.4th at 1081. "'[T]o establish a prima facie case of age discrimination, the plaintiff must show that (1) he is within the protected age group; (2) he was doing satisfactory work; (3) he was discharged; and (4) his position was filled by a younger person.'" *Id.* (quoting *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 920 (10th Cir. 2004)); *accord Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015) (explaining that a prima facie case of age discrimination requires "a plaintiff to show, by a preponderance of the evidence, that she is a member of a protected class, she suffered an adverse employment action, and the challenged action occurred under circumstances giving rise to an inference of discrimination"). These elements are not intended to be rigid or formal, particularly in an age discrimination case, but rather their purpose is to establish "an initial inference of unlawful discrimination warranting a presumption of liability in plaintiff's favor." *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1056 (10th Cir. 2020) (citation omitted). If a plaintiff succeeds in making out a prima facie case, "the burden of production then shifts to the employer to identify a legitimate, nondiscriminatory reason

---

[7] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

for the adverse employment action." *Id.* (citation omitted); *see Markley*, 59 F.4th at 1081.

"'Once the employer identifies a legitimate reason for its action, the burden shifts back to

the employee to prove that the proffered legitimate reason was a pretext for

discrimination.'" *Markley*, 59 F.4th at 1081 (quoting *Riggs*, 497 F.3d at 1114–15).

### 1. There is no evidence to support an inference that Mr. Sanders' termination was because of his age.

Aerotek contends that Sanders cannot establish a prima facie case of age

discrimination. *See* Motion at 17–23. Aerotek initially challenges Mr. Sanders' ability to

satisfy the second element of his prima facie burden, i.e., that he was performing

satisfactory work. Motion at 18. Aerotek notes, however, that "[t]here is an open question

in the Tenth Circuit as to whether and to what extent an employee must prove satisfactory

job performance as part of the prima facie burden." *Id.* at 19 n.4 (citing *Palzer v.

Coxcom, LLC*, Case No. 15-CV-00564-GKF-JFJ, 2019 WL 11585348, at *9 (N.D. Okla.

Sept. 17, 2019) (citing cases)).

As noted above, the Tenth Circuit has explained that the prima facie elements of

an age discrimination claim are not rigid or formalistic. *See Frappied*, 966 F.3d at 1056;

*Bennett*, 792 F.3d at 1266. Notably, whether an employee was performing satisfactory

work is absent from the Tenth Circuit's formulation in *Bennett*. The circuit noted in

*Bennett* that the district court had analyzed the plaintiff's prima facie case of

discrimination using a four-part articulation of the test and explained that the "Tenth

Circuit has utilized a number of similar versions of the test, expressing a preference for

more concise formulations." 792 F.3d at 1266 n.1.

Similarly, in *Mattera v. Gambro, Inc.*, the circuit concluded that a plaintiff's insistence "her work was satisfactory [was] sufficient to satisfy [the second] element of a prima facie case." 94 F. App'x 725, 728 (10th Cir. 2004) (unpublished) (explaining the Tenth Circuit has long held that even in the face of alleged work rules violations, a plaintiff may make out a prima facie case of discrimination by her own testimony that her work was satisfactory) (citing *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1166 n.3 (10th Cir. 1998); *MacDonald v. E. Wyo. Mental Health Ctr.*, 941 F.2d 1115, 1121 (10th Cir. 1991), *abrogated on other grounds by Hare v. Denver Merch. Mart, Inc.*, 255 F. App'x 298, 305 (10th Cir. 2007) (unpublished)). Likewise, in *MacDonald*, the Tenth Circuit concluded "a plaintiff may make out a prima face case of discrimination in a discharge case . . . by her own testimony that her work was satisfactory, even when disputed by her employer . . . ." 941 F.2d at 1121 (internal citations omitted).

Mr. Sanders admits that he "failed to perform," that he "refused to clean COVID-19 rooms because [he] wasn't given the proper PPE," and that he repeatedly failed to respond in a timely fashion to walkie-talkie calls from his shift lead, sometimes waiting as long as fifty minutes. *See* Sanders' Dep. Tr. at 82:16; 85:19–20, 24–25; 128:20–22; 138:14–25; 139:1–3; and 142:8–25. He also asserts in his deposition testimony, however, that doctors "praise[d]" his cleaning of COVID-19 rooms, and that Aerotek fabricated his performance deficiencies after he complained of Ordonez taking him into an ER isolation area without a mask. *See id.* at 105:3–13; 116:7–25; *see also* [Doc. No. 69-11]. Moreover, Sanders asserts that the OESC's decision to award him employment benefits shows he did not engage in misconduct in his employment with Aerotek. Response at 2–

3; *see also* [Doc. No. 75-2 at 6].

The Court need not decide whether Sanders has established this second element because he offers no evidence of disparate treatment based on his age to attempt to satisfy his prima facie burden. *See* Motion at 19–23. "The Tenth Circuit has long held that a plaintiff must prove but-for causation to hold an employer liable under the ADEA." *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1277 (10th Cir. 2010). Under this standard, an employer may be held liable even if other factors contributed to the employee's termination "as long as 'age was the factor that made a difference.'" *Id.* (quoting *Wilkerson v. Shinseki*, 606 F.3d 1256, 1266 (10th Cir. 2010)).

Mr. Sanders attempts to make out a prima face case of age discrimination by pointing to Ordonez, his shift lead, who was not an employee of Aerotek. Sanders asserts that Integris housekeeping supervisors gave Ordonez, a Caucasian female in her mid to late twenties, a medical accommodation on account of her pregnancy, exempting her from cleaning COVID-19 rooms. *See* Compl. [Doc. No. 1] ¶¶ 16–18, 47; *see also* Sanders' Dep. Tr. at 102:5–22; 106:3–20. Sanders admittedly never requested a medical accommodation. *See* Sanders' Dep. Tr. at 85:11–25. He also contends that, unlike him, Ordonez was fit tested and provided with a proper-fitting N95 mask. *See Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173–74 (10th Cir. 2005) (explaining where comparison of others similarly situated is the method chosen by the plaintiff to raise an inference of discrimination, the court properly analyzes the claim under those terms).

Integris housekeeping supervisors' treatment of Ordonez, however, does not give rise to an inference of age discrimination with respect to Sanders because Sanders and

Ordonez are not similarly situated in all relevant respects. They do not share the same employer or same supervisor. Nor do they share the same position: Ordonez was a shift lead while Sanders was not. Ordonez was also pregnant at the time and presented, at least according to Sanders, a medical reason for an accommodation by Integris while Sanders admittedly never requested a medical accommodation. Moreover, Sanders offers no evidence that Ordonez received a final written warning and then refused to perform a required job task whereas Sanders refused to clean COVID-19 rooms just days after receiving a final warning.

Mr. Sanders also claimed in his deposition that younger employees were fit tested well before him for an N95 mask. When pressed, however, Sanders admitted he only "imagine[d] that the younger employees had already been fit test[ed]," and that he had "no proof" that younger employees were fit tested before him. Sanders' Dep. Tr. at 124:3–15. Moreover, Sanders' assertion that younger employees were fit tested before him is refuted by the emails exchanged between Arenas and Singleton on May 11, 2020, which indicate that the entire staff for the third shift were fit tested on the same day. [Doc. No. 69-12 at 3]. In other words, the summary judgment evidence establishes that Sanders was not treated any differently as to the timing of his N95 fit test.

Additionally, Mr. Sanders asserted in his deposition that "on occasions" he was the only one cleaning COVID-19 rooms while his shift leads, who were presumably younger and not black, worked predominantly in the maternity ward. *See* Sanders' Dep. Tr. at 92:3–21. However, again when pressed, Sanders admitted he had no way of knowing if others besides him were cleaning rooms that had housed a COVID-19 patient.

*See id.* at 60:14–24.

Mr. Sanders does not present any evidence suggesting an inference of age discrimination. He could not point to any age-related remarks made toward him. *See id.* at 124:19–21. Nor was he aware of any pay discrepancies based on age or being provided fewer work opportunities than his co-workers based on age. *See id.* at 124:22–25; 125:1–2. Aside from Ordonez, Sanders points to no other employee that was treated more favorably because of their age. *See id.* at 112:15–23. In fact, Sanders claimed in his deposition that every employee on his third shift experienced a hostile work environment, not just him. *See id.* at 23:24–25; 24:1–16.

In summary, Sanders offers no evidence of disparate treatment based on his age nor any evidence that raises an inference of age discrimination; thus, he does not establish his prima facie burden.[8]

## 2.    Aerotek presents legitimate, nondiscriminatory reasons for Mr. Sanders' termination.

Alternatively, even if Sanders could make out a prima facie case of age discrimination, the burden of production would shift to Aerotek to identify a legitimate, nondiscriminatory reason for Sanders' termination. *Markley*, 59 F.4th at 1081; *Frappied*, 966 F.3d at 1058. At summary judgment, an employer is not required "to litigate the merits of the reasoning," nor prove that the reason offered is genuine or "was applied in a nondiscriminatory fashion." *See Frappied*, 966 F.3d at 1058 (citation omitted). Rather, an

---

[8] Nor does Sanders show that Aerotek replaced him with an employee outside his protected class. [Doc. No. 69-2 ¶ 19].

employer must state a reason for the termination "that is not, on its face, prohibited" and is "reasonably specific and clear." *See id.* (citation omitted). The Tenth Circuit has explained that an employer's burden in this regard is "exceedingly light." *See Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007); *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1165 (10th Cir. 2007) (en banc).

Here, Aerotek proffers specific legitimate, nondiscriminatory reasons for terminating Mr. Sanders' employment. It is undisputed by the parties that Sanders' employment with Aerotek was coextensive with his temporary assignment with Integris, meaning that his Aerotek employment would end if his Integris assignment ended. Sanders' signed employment contract with Aerotek specifically states as much in paragraph 2. *See* [Doc. No. 69-19 ¶ 2]. Aerotek ended Sanders' assignment with Integris based on multiple performance issues, which Aerotek independently verified. At least two of these performance-based reasons, Sanders does not dispute, i.e., that he was not timely responding to walkie-talkie calls from his shift lead and his refusal to clean rooms discharged by COVID-19 patients the weekend of May 15, 2020, after he was counseled and given a final written warning by Aerotek on May 13, 2020. The final written warning cautioned Sanders that further failure to adhere to work rules could lead to his termination. [Doc. No. 69-13 at 2]. He acknowledged receiving the final written warning, although he refused to sign it.

Other courts have accepted that a legitimate, nondiscriminatory reason for termination can be violations of office policy. *See, e.g.*, *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1119–20 (10th Cir. 2007) (explaining that the defendant had produced a

legitimate, nondiscriminatory reason for termination where the bank's policy made it clear that termination could result from a branch manager refunding overdraft fees on branch employees' accounts without approval); *Raymond v. Select Specialty Hosp. – Tulsa/Midtown, LLC*, 375 F. Supp. 3d 1203, 1213 (N.D. Okla. 2019) (concluding that the defendants had met their "exceedingly light" burden to proffer a legitimate, nondiscriminatory reason where the defendants contended the plaintiff was terminated in accordance with the employee handbook, which listed sleeping while on duty as unacceptable behavior justifying immediate termination). While Sanders contends that the OESC's decision to award unemployment benefits demonstrates no misconduct on his part was shown, Response at 2–3, that is not the inquiry before this Court, and poor performance is a legitimate nondiscriminatory reason for an employee's discharge. *See, e.g.*, *Hayes*, 1997 WL 111262, at \*2 (explaining that misconduct to deny unemployment benefits under Okla. Stat. tit. 40, § 2-406 is not the same inquiry as reasons justifying termination from employment because an employee may be terminated for many reasons not rising to the level of misconduct); *DeSanzo v. AHS Southcrest Hosp., LLC*, 842 F. App'x 300, 302–03 (10th Cir. 2021) (unpublished) (affirming the district court's summary judgment in favor of the defendant-hospital on the plaintiff-nurse's age discrimination claim under the ADEA where the district court determined that the plaintiff's poor work performance was a legitimate, nondiscriminatory reason for termination and that the plaintiff failed to establish pretext). The Court, therefore, concludes that the undisputed evidence cited by Aerotek above is more than sufficient to satisfy its burden of articulating a justifiable, nondiscriminatory reason for Sanders'

termination.

### 3.    Aerotek's decision to terminate Mr. Sanders' employment was not pretextual under the ADEA.

Accordingly, the burden shifts to Mr. Sanders to show that the proffered reasons are a mere pretext for discrimination. To avoid summary judgment, Sanders must present sufficient evidence to create a genuine factual dispute regarding the veracity of Aerotek's nondiscriminatory reasons. *See Markley*, 59 F.4th at 1081–82. An employee can show pretext "'by demonstrating the [employer's] proffered reason is factually false, or that discrimination was a primary factor in the employer's decision.'" *Id.* (quoting *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017)). An employee can show that discrimination was a primary factor "by revealing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *DePaula*, 859 F.3d at 970 (citation omitted); *see also Markley*, 59 F.4th at 1082 (same). Evidence of pretext may also take a variety of other forms, "including evidence the plaintiff 'was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.'" *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 539 (10th Cir. 2014) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)). Further, an employer's failure to conduct a fair investigation of the employee's alleged misconduct, which prompted the termination, can bear on the question of pretext. *See id.*; *Markley*, 59 F.4th at 1082.

In his Response, Mr. Sanders asserts that Aerotek "manufactur[ed] [his]

performance issue[s]" in emails from March 2020 through May 2020, and that this is "evidence of . . . pretext." *See* Response at 1–2. Additionally, in his deposition testimony, Sanders claimed that Aerotek began fabricating his performance deficiencies after the onset of COVID-19, asserting he had no performance issues prior to the pandemic. *See* Sanders' Dep. Tr. at 116:16–24; 117:1–16. Specifically, Sanders claims in his deposition that the dirty room complaint of March 17, 2020, was a fabrication because "there was always blood on the [bed] rails." *See id.* at 133:1–134:20. Alternatively, he asserts that the responsibility fell on the shift lead to "go back and check all the rooms . . . [s]o if anything was left . . . it was left by the lead." *Id.* at 135:19–22. Nevertheless, Sanders admits that he refused to clean COVID-19 rooms assigned to him and that he neglected to timely respond to walkie-talkie calls.[9]  "[I]f the employer offers one reason which, standing alone, would have caused it to terminate the plaintiff, then debunking the employer's other reasons will not defeat summary judgment." *Cooper v. Wal-Mart*

---

[9] Although Sanders tries to excuse his untimely responsiveness to walkie-talkie calls by claiming he cannot be bound by an unwritten policy and alleges that he, Ordonez, and another housekeeper were the only ones with walkie-talkies because they were "staged as retaliation for [him] reporting [Ordonez]," Sanders does not present sufficient evidence to create a genuine factual dispute regarding the veracity of this reason offered by Aerotek as a reason for his termination. Sanders' Dep. Tr. at 136:25–137:20; 157:10–24. First, a policy does not have to be in writing to provide a legitimate, nondiscriminatory reason for an employer's action. *See Medlock v. United Parcel Serv., Inc.*, 608 F.3d 1185, 1192–93 (10th Cir. 2010). Second, the undisputed evidence is that Arenas told Sanders that if he continued to fail to timely respond to walkie-talkie calls, she would terminate him, and that Sanders continued to be nonresponsive to walkie-talkie calls after Arenas told him it was a terminable offense. The final written warning to Sanders indicated he needed to improve on his responsiveness to walkie-talkie calls, and Sanders told Lozano in their May 13 telephone call that he would improve. *See* Sanders' Dep. Tr. at 168:10–169:5.

*Stores, Inc.*, 296 F. App'x 686, 691 (10th Cir. 2008) (unpublished) (citing *Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1310 (10th Cir. 2005)).

Although Mr. Sanders alleges that he was treated differently than Ordonez, they are not similarly situated employees as she was his shift leader. Moreover, Sanders fails to point to anyone that violated work rules of comparable seriousness. He was unable to identify any other employee who also failed to timely respond to walkie-talkie calls or continued to do so after being counseled multiple times about it. Additionally, Sanders lacks any evidence that other employees refused to clean vacant COVID-19 rooms and were retained despite their refusal. Finally, OESC's determination on unemployment benefits does not suggest that Aerotek's decision to terminate was pretextual, as the two involve different inquiries. *See Hayes*, 1997 WL 111262, at *2.

In summary, there is no evidence that age played a determinative role in Mr. Sanders' employment termination, nor is there a genuine issue as to whether Aerotek's explanation for Sanders' termination was pretextual. *See Markley*, 59 F.4th at 1083 (explaining that an employment discrimination plaintiff cannot survive summary judgment where his evidence presents nothing more than a speculative basis for believing discrimination was a motivating factor). Thus, Aerotek is entitled to summary judgment on Sanders' ADEA age discrimination claim.

### B.    Aerotek is entitled to summary judgment on Mr. Sanders' Title VII race discrimination claim.

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race."

42 U.S.C. § 2000e-2(a)(1). Sanders' Title VII race discrimination claim, like his ADEA age discrimination claim, is subject to the *McDonnell Douglas* burden-shifting framework. *See Walkingstick Dixon v. Okla. ex rel. Reg'l Univ. Sys. of Okla. Bd. of Regents*, 125 F.4th 1321, 1333–34 (10th Cir. 2025).

The Tenth Circuit has adopted a four-part prima facie test for discriminatory discharge cases under Title VII. *See Kendrick*, 220 F.3d at 1227–29 (explaining that *Perry v. Woodward*, 199 F.3d 1126 (10th Cir. 1999) made clear that the elements of a prima facie case are the same in hiring and discharge cases). That is, a plaintiff must show (1) he "belongs to a protected class; (2) [he] was qualified for [his] job; (3) despite [his] qualifications, [he] was discharged; and (4) the job was not eliminated after [his] discharge." *Perry*, 199 F.3d at 1138; *see also Walkingstick Dixon*, 125 F.4th at 1336 (citing same four elements). Here, the Court moves to the second step of the burden-shifting framework without deciding whether Sanders has made out a prima facie case of race discrimination.[10]

### 1.    Aerotek presents legitimate, nondiscriminatory reasons for Mr. Sanders' termination.

As evidenced above, Aerotek has proffered specific legitimate, nondiscriminatory reasons for terminating Sanders' employment. Mr. Sanders does not dispute two of these

---

[10] In its Motion, Aerotek groups its analysis of Sanders' age and race discrimination claims. *See* Motion at 17–28. Although it appears Aerotek challenges Sanders' prima facie burden of race discrimination, Aerotek cites mostly to ADEA cases. Additionally, *Walkingstick Dixon* was decided after the parties' briefing; thus, the Court assumes without deciding that Sanders could make out a prima facie case under the elements stated in *Walkingstick Dixon* and *Perry* and turns to the other steps in the burden-shifting framework.

performance-based reasons: (1) he did not respond timely to walkie-talkie calls from his shift lead; and (2) his refusal to clean rooms discharged by COVID-19 patients the weekend of May 15, 2020, after he was counseled and given a final written warning on May 13. For the same reasons noted above, the OESC's decision is not dispositive of this issue, as it addresses an issue different than that before this Court. *See Hayes*, 1997 WL 111262, at *2; *see also Stuart v. Erickson Living Mgmt.*, 822 F. App'x 682, 685 (10th Cir. 2020) (unpublished) (affirming the district court's judgment in a Title VII race discrimination case where the employer's legitimate, nondiscriminatory reason for the employee's termination was based on poor performance). Thus, Aerotek "has met its burden of providing a facially nondiscriminatory reason for" terminating Sanders, and the Court turns to pretext. *See Kendrick*, 220 F.3d at 1230.

### 2.    Aerotek's decision to terminate Mr. Sanders' employment was not pretextual under Title VII.

As evidenced above, Mr. Sanders has not presented any evidence that Aerotek's reasons for termination are "unworthy of belief." *See id.* Rather, the undisputed summary judgment evidence demonstrates that Aerotek's stated reasons were held in good faith at the time of Sanders' discharge. *See Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (explaining that the relevant inquiry is whether the employer honestly believed its proffered reasons for termination and acted in good faith upon those beliefs).

In summary, there is no evidence that race played a determinative role in Sanders' termination. Thus, Aerotek is entitled to summary judgment on Sanders' Title VII race discrimination claim.

**C.      Aerotek is entitled to summary judgment on Mr. Sanders'
        ADEA and Title VII retaliation claims.**

The ADEA makes it unlawful for employers to discriminate against an employee

because he "has opposed any practice made unlawful by this section, or because [he] . . .

has made a charge . . . under this chapter." 29 U.S.C. § 623(d). Likewise, Title VII makes

it unlawful for employers to discriminate against an employee "because he has opposed

any practice made an unlawful employment practice by this subchapter, or because he has

made a charge . . . under this subchapter." 42 U.S.C. § 2000e-3(a).

Mr. Sanders lacks direct evidence of retaliation; thus, the *McDonnell Douglas*

burden-shifting framework again applies. *See Hinds v. Sprint/United Mgmt. Co.*, 523

F.3d 1187, 1201 (10th Cir. 2008) (applying *McDonnell Douglas* to the plaintiff's ADEA

retaliation claim where he lacked direct evidence of retaliation); *Bekkem v. Wilkie*, 915

F.3d 1258, 1267 (10th Cir. 2019) (explaining that the *McDonnell Douglas* framework

applies to the plaintiff's Title VII retaliation claim where no direct evidence of retaliation

exists). The Court's analysis begins and ends at the first step because Sanders has failed

to establish a prima facie case of retaliation under either the ADEA or Title VII.

"A prima facie case of retaliation requires the plaintiff to show that (1) he . . .

engaged in protected opposition to discrimination, (2) a reasonable employee would have

considered the challenged employment action materially adverse, and (3) a causal

connection existed between the protected activity and the materially adverse action."

*Hinds*, 523 F.3d at 1202; *see Bekkem*, 915 F.3d at 1267. Aerotek contends that Sanders

cannot establish that he engaged in activity protected by the ADEA or Title VII to satisfy

the first element of his prima facie case. *See* Motion at 28–31. The Court agrees.

Mr. Sanders' retaliation claims center on the complaint he made about Ordonez taking him into a COVID-19 isolation area without any PPE. He contends that Ordonez, in turn, retaliated against him by assigning him COVID-19 rooms to clean following his complaint. *See* Sanders' Dep. Tr. at 53:9–14; 103:20–104:8. Sanders also asserts that two Aerotek employees, Singleton and Lozano, retaliated against him by sharing his complaint with Arenas and Trim at Integris. *See id.* at 113:14–114:5.

"Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by the ADEA," *Hinds*, 523 F.3d at 1203, or a practice made unlawful by Title VII for purposes of a Title VII retaliation claim. *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) (explaining that "[o]pposition to an employer's conduct is protected by § 2000e-3(a) only if it is opposition to a 'practice made an unlawful employment practice by [Title VII]'"). "General complaints about company management" or a "'vague reference to discrimination and harassment without any indication that th[e] misconduct was motivated by [age or race] does not constitute protected activity and will not support a retaliation claim.'" *Hinds*, 523 F.3d at 1203 & n.13 (quoting *Anderson v. Acad. Sch. Dist. 20*, 122 F. App'x 912, 916 (10th Cir. 2004) (unpublished)); *see also Petersen*, 301 F.3d at 1188 ("Title VII does not prohibit all distasteful practices by employers."). In other words, to sustain a retaliation claim under the ADEA, Sanders must have opposed or complained about age discrimination. Likewise, to sustain a retaliation claim under Title VII, he must have opposed or

complained about race discrimination. His complaint about being taken to a COVID-19 isolation area without proper PPE makes no reference to his age or race. *See, e.g.*, Sanders' 5/18/20 Email to Lozano [Doc. No. 69-15 at 2] (no reference to age or race discrimination); Sanders' 6/1/20 Email to Lozano [Doc. No. 69-20 at 2] (no reference to age or race discrimination).

Without evidence of having engaged in any activity protected under the ADEA or Title VII prior to his final warning or discharge, Mr. Sanders cannot satisfy a critical element of his prima facie burden.[11] Thus, Aerotek is entitled to summary judgment on Sanders' ADEA and Title VII retaliation claims.

## V.    CONCLUSION

Aerotek is entitled to summary judgment on Mr. Sanders' ADEA age discrimination and retaliation claims and his Title VII race discrimination and retaliation claims. Consequently, the Court GRANTS Defendant Aerotek Inc.'s Motion for Summary Judgment [Doc. No. 69]. A separate judgment will follow.

IT IS SO ORDERED this 30th day of September 2025.

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE

---

[11] In his complaint, Sanders alleges that in March 2020, Ordonez "intentionally attempted to expose him and other blacks to the corona virus." *See* Compl. ¶ 75. The evidence of record, however, does not support that Sanders' complaint about Ordonez involved or even referenced age or race.